Filed 2/18/21  Building a Better Redondo v. City of Redondo Beach CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| BUILDING A BETTER REDONDO et al., | B294328 |
| Plaintiffs and Respondents, | (Los Angeles County Super. Ct. No. BS166124) |
| v. | |
| CITY OF REDONDO BEACH et al., | |
| Defendants and Appellants; | |
| CENTERCAL PROPERTIES, LLC et a1., | |
| Real Parties in Interest and Appellants. | |

APPEAL from orders of the Superior Court of Los Angeles County, James C. Chalfant, Judge.  Affirmed.

The Sohagi Law Group, R. Tyson Sohagi and Mark J.G. Desrosiers; Michael W. Webb, City Attorney and Cheryl Park, Assistant City Attorney, for Defendants and Appellants City of Redondo Beach and City Council of the City of Redondo Beach.

Shumener, Odson & Oh, Betty M. Shumener, Henry H. Oh and John D. Spurling; Allen Matkins Leck Gamble Mallory & Natsis and Patrick A. Perry for Real Parties in Interest and Appellants Centercal Properties and Redondo Beach Waterfront.

Angel Law and Frank P. Angel for Plaintiffs and Respondents Building a Better Redondo and James Light.

---

## INTRODUCTION

Appellant the City of Redondo Beach (the City) partnered with appellants and real parties in interest Redondo Beach Waterfront, LLC and CenterCal Properties, LLC (real parties) to redevelop the City's harbor area. Respondents, Building a Better Redondo, Inc. and James Light, filed this action for a writ of mandamus targeting the proposed project. The crux of their petition concerned claimed violations of the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.), alleging deficiencies in the City's certification of a required Environmental Impact Report (EIR). Other causes of action

in the petition included challenges to the project under the public trust doctrine and challenges to the City's administrative appeal procedure.

The trial court ultimately found for respondents on a number of claims relating to the City's certification of the EIR. The court found against respondents on essentially all remaining issues. It later awarded respondents over $680,000 in attorney's fees under Code of Civil Procedure section 1021.5,[1] and over $80,000 in costs, holding appellants jointly and severally liable.

On appeal, real parties, joined by the City, challenge these awards. They argue respondents were not entitled to fees or costs, asserting that respondents obtained only trivial success. They further advance numerous complaints about the amount of the fee award, including, inter alia: (1) the trial court used an improper methodology to determine the amount; (2) the court insufficiently reduced the amount to reflect respondents' partial success; (3) respondents requested an excessive hourly rate for their lead attorney; (4) and the court abused its discretion in granting a fee enhancement. The City separately claims the court erred in awarding fees for certain filings and in holding it jointly and

---

[1]     Undesignated statutory references are to the Code of Civil Procedure.

severally liable with real parties. It further asserts a challenge to the amount awarded for a particular cost item.[2]

Finding no error, we affirm.

## BACKGROUND

A. *The Project and the Administrative Process*

The City partnered with real parties to redevelop the Redondo Beach King Harbor Pier area. The proposed project was to include construction of over 511,000 square feet of new development. It included plans to modify Seaside Lagoon, "a 3.6-acre non-tidal saltwater, sand-bottom swimming facility." Water for the lagoon is drawn from the ocean, used by a nearby power plant, and then chlorinated before entering the lagoon, in order to meet county health regulations for public swimming. A rock revetment separates the lagoon from the harbor waters. Under the proposed project, the revetment was to be eliminated, opening the existing lagoon to untreated harbor water. The project was also to include a new boat-launch ramp.

The City circulated a draft EIR for the project in 2015. In July 2016, after receiving written public comments on the draft, the City released a final EIR. This document included a staff-recommended alternative for a new location for the boat-launch ramp, a location the draft had rejected. The

---

[2]     Real parties do not join in the City's additional contentions. When discussing contentions the City alone makes, we so indicate.

4

City's harbor commission later certified the final EIR and approved the permits for the project, selecting the staff's recommended alternative for the boat-launch ramp location. Respondents appealed the harbor commission's decisions to the City council, which ultimately denied their appeal.

B. *Respondents' Petition for a Writ of Mandate*

Respondent Building a Better Redondo is a nonprofit corporation "dedicated to preserving and enhancing resident quality of life in the City." Respondent Light is a city resident and the president of Building a Better Redondo. In November 2016, respondents petitioned the superior court for a writ of mandate against the City. They included CenterCal and Redondo Beach Waterfront as real parties in interest. Respondents subsequently filed a first amended petition asserting six causes of action. The first cause of action alleged the final EIR failed to comply with CEQA in about a dozen different ways, including: (1) failing to disclose, evaluate, and mitigate the public health and safety effects of opening Seaside Lagoon to harbor water; (2) failing to disclose, evaluate, and mitigate the waterside-traffic and safety effects of the boat-launch ramp's location; (3) failing to disclose, evaluate, and mitigate public-view impacts from the project on a public park; and (4) failing to address whether the project complied with a coastal land use plan that prohibited obstruction of public views from the public park to the ocean.

5

Respondents' second cause of action alleged failure to recirculate the EIR for public comment after the addition of the new staff-recommended alternative for the boat-launch ramp's location.  The third cause of action alleged violation of the public trust doctrine, contending the project's adverse effects on recreation at Seaside Lagoon and interference with coastal access for certain uses precluded certification of the project.  The fourth and fifth causes of action challenged the validity of the City's CEQA-appeal procedures.  Finally, the sixth cause of action alleged violation of the California Public Records Act (Gov. Code, § 6250 et seq.), asserting that the City failed to produce certain records and thus hindered respondents' preparation of the administrative record for this proceeding.  Respondents later abandoned the sixth cause of action and did not brief it.

## C. *The Trial Court's Ruling on the Merits*

In May 2018, after receiving extensive briefing and voluminous documentary evidence, and hearing oral argument, the trial court issued a 103-page decision granting respondents' petition in part.  The court agreed that the City's EIR was deficient with respect to the boat-launch ramp's location, the opening of Seaside Lagoon to the harbor, and visual impacts from the project.  As to the boat-launch ramp's location, the court agreed that the draft EIR had inadequately disclosed and assessed its navigational-safety impacts.  It found that the draft's insufficient analysis, together with the final EIR's selection of a new

6

recommended location that was previously rejected by the draft, deprived the public of the required opportunity to submit written comments on the chosen location's safety impacts and receive written responses from the City. Regarding the opening of Seaside Lagoon to the harbor, the court found, among other things, that the EIR included an incomplete discussion of water-quality and public-health impacts from potential exposure of swimmers to contaminants in the harbor water.  Finally, as to the project's visual impacts, the court found that the EIR impermissibly failed to address (a) the visual impact of a proposed hotel on southern views from a public park, and (b) the project's compliance with the coastal land use plan, which prohibited obstruction of ocean views from the park. The court therefore ordered the City to set aside its certification of the final EIR and prepare a new CEQA document properly addressing the relevant issues.  The court denied the petition on all other issues, save for a minor issue not relevant here.

D. *Respondents' Motion for Attorney Fees*

Following the trial court's ruling on the merits, respondents sought almost $960,000 in attorney fees as private attorneys general under section 1021.5.  Their calculation included a requested fee enhancement in the form of a 1.4 multiplier applied to their requested lodestar amount.

Appellants opposed this request, arguing that respondents had achieved such a poor result that they were not successful parties, did not enforce an important public right, and did not confer a significant benefit on the public for purposes of eligibility for fees under section 1021.5. Alternatively, appellants challenged the requested amount. They argued, inter alia: (1) the requested hourly rate of $650 for respondents' lead attorney, Frank Angel, was too high; (2) the court should reduce the lodestar amount by 80 percent to account for respondents' limited success, and should exclude work on certain unsuccessful filings from the award; (3) respondents' billing statements included various excessive, duplicative, and non-credible items, as well as impermissible block-billing; and (4) a fee enhancement was not warranted. The City additionally argued that real parties should be solely liable for any attorney fee award because an indemnity agreement between the parties required real parties to indemnify the City for litigation costs, including fee awards.

The trial court issued a 20-page tentative ruling granting respondents' motion for attorney fees in large part, determining they had achieved significant success that entitled them to fees. The court concluded that respondents were successful parties, finding they had "prevailed on several significant EIR issues," including the impacts of the boat-launch ramp location, the human-health impacts of changes to Seaside Lagoon, and the visual impact of the project on views from a public park. The court referenced

8

our Supreme Court's description of the EIR -- the subject of respondents' successful claims -- as "the 'heart of CEQA.'" (*Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 564 (*Citizens of Goleta Valley*).) The court further observed that compliance with the procedures it had ordered could result in changes to the project. The trial court determined that respondents' victory enforced an important public right to disclosure of human-health, view, and navigational-safety impacts from the proposed project. It further concluded that respondents' successful claims conferred a significant benefit on the public by allowing it to provide additional input on these issues.

As to the amount of requested fees, the trial court reduced respondents' requested fees by over $275,000, resulting in an adjusted lodestar of about $429,000 and a total award of about $683,000. Initially, the court found that Angel's $650 hourly rate was reasonable. It agreed, however, that respondents' partial success warranted a reduction of the lodestar. Nevertheless, it determined that an 80 percent reduction was "far too severe" and would act as a deterrent to private attorneys general. The court therefore reduced the lodestar by only 20 percent. It further reduced the time claimed for certain tasks on various grounds, including excessive time claimed for work on various filings and impermissible block-billing related to work on the reply brief.

The trial court agreed with respondents that the requested fee enhancement was warranted. The court found

9

that the case was complex and raised at least one novel issue, which involved a "rarely used provision" of CEQA requiring EIR review of a project's substantial adverse effects on human beings. It further found that respondents' counsel "showed commendable skill in presenting these issues and litigating them." Indeed, the trial court praised the work of counsel for all parties, stating that the briefs "were incredibly thorough and well-constructed." The court noted that respondents' fee agreement with their counsel provided for a $90,000 fee cap and a substantially reduced hourly rate, and that respondents were ultimately unable to afford even that amount, ultimately paying counsel only about $66,000. The court found these circumstances placed much of the risk of failure in the litigation on counsel, who essentially worked on a partial contingency basis. Per the trial court, these factors weighed in favor of a fee enhancement. The court considered whether the award would be likely to fall on taxpayers, which would weigh against an enhancement, but concluded that the indemnity agreement between the City and real parties made this unlikely.

E. *Appellants' Motion to Strike or Tax Costs*

Respondents additionally sought over $126,000 in costs under section 1032. Appellants moved to strike or tax costs. Similar to their arguments against the attorney fee award, appellants argued that given respondents' limited success, respondents were not successful parties entitled to costs

under section 1032.  In the alternative, appellants raised various challenges to the items and amounts claimed by respondents.  Among other things, appellants objected to the billing rate respondents sought for the time one of their attorneys spent compiling the administrative record, and to certain costs respondents claimed for the preparation of administrative hearing transcripts.

Citing its analysis of respondents' entitlement to attorney fees, the trial court concluded respondents were successful parties entitled to costs.  The court agreed, however, that a lower billing rate was appropriate for the preparation of the administrative record, and it also taxed several other cost items.  It did not tax the costs requested for preparation of the transcripts.  Overall, the trial court awarded respondents over $82,000 in costs.

## DISCUSSION

### A. *Environmental Review Under CEQA*

Enacted in 1970, CEQA's basic purposes are:  "(1) to inform governmental decision makers and the public about the potential significant environmental effects of proposed activities, (2) to identify ways that environmental damage can be avoided or significantly reduced, (3) to prevent significant, avoidable damage to the environment by requiring changes in projects through the use of alternatives or mitigation measures when the governmental agency finds the changes to be feasible, and (4) to disclose to the public the reasons why a governmental agency approved the project

11

in the manner the agency chose if significant environmental impacts are involved." (*San Joaquin Raptor/Wildlife Rescue Center v. County of Stanislaus* (1996) 42 Cal.App.4th 608, 614 (*San Joaquin*).)  Under CEQA, when a proposed project involves governmental action, the relevant agency must conduct a preliminary review to determine if there is a possibility that the activity would have a significant effect on the environment.  (*San Joaquin, supra*, at 614.)  If this initial study finds substantial evidence that such a possibility exists, the agency must prepare an EIR.  (*San Joaquin,* at 614-615.)

If an EIR is required, the agency must:  (1) prepare a draft EIR and make it available for public review; (2) evaluate comments on environmental issues from persons who reviewed the draft, and prepare a written response; and (3) prepare a final EIR, containing the information included in the draft EIR, comments received in the review process, and the response of the agency to the comments received. (*San Joaquin*, *supra*, 42 Cal.App.4th at 615.)  The purpose of the EIR "is to inform the public and its responsible officials of the environmental consequences of their decisions *before* they are made."  (*San Joaquin,* at 615.)  "Thus, the EIR 'protects not only the environment but also informed self-government.'"  (*Ibid*.)

B. *Appellants' Challenges to Respondents' Entitlement to Attorney Fees*

"Section 1021.5 codifies the 'private attorney general' doctrine of attorneys fees articulated in *Serrano v. Priest* (1977) 20 Cal.3d 25 . . . and other judicial decisions." (*Flannery v. California Highway Patrol* (1998) 61 Cal.App.4th 629, 634.) "The statute gives the trial court discretion to award fees to a successful party if (1) its action has resulted in the enforcement of an important public right, (2) the general public or a large class of persons has received a significant benefit, (3) the burden of private enforcement is disproportionate to the litigant's personal interest, and (4) it is unfair to make a successful plaintiff pay the fees out of any recovery." (*Concerned Citizens of La Habra v. City of La Habra* (2005) 131 Cal.App.4th 329, 334 (*Concerned Citizens*).)

"The award of fees under section 1021.5 is an equitable function, and the trial court must realistically and pragmatically evaluate the impact of the litigation to determine if the statutory requirements have been met. [Citation.] This determination is 'best decided by the trial court, and the trial court's judgment on this issue must not be disturbed on appeal "unless the appellate court is convinced that it is clearly wrong and constitutes an abuse of discretion." [Citations.]'" (*Concerned Citizens, supra*, 131 Cal.App.4th at 334.)

Appellants contend that given respondents' partial success in this action, they (1) were not successful parties,

13

(2) did not enforce an important public right, and (3) did not confer a significant benefit on the public.[3] We discuss their contentions in turn.

### 1. *Successful Parties*

"Under section 1021.5, '[a] "successful party" means a "prevailing" party.' [Citation.] 'It is settled, however, that a party need not prevail on every claim presented in an action in order to be considered a successful party within the meaning of the section.' [Citation.] A party who ""'succeed[s] on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit"''" [citation] may be considered a prevailing party 'for attorneys' fees purposes.' [Citation.] 'The significance of the . . . issue was a matter for the trial court's judgment.'" (*Sweetwater Union High School Dist. v. Julian Union Elementary School Dist.* (2019) 36 Cal.App.5th 970, 982 (*Sweetwater*).)

The trial court reasonably determined that respondents were successful parties. In reaching this conclusion, the court found that respondents had "prevailed

---

[3]     Appellants also argue the trial court used an impermissible methodology to calculate the amount of the award, and claim this should result in outright reversal of the award. Appellants make no attempt to explain why a claimed error in determining the amount should result in no award at all. Accordingly, we address appellants' argument regarding the trial court's methodology as part of their challenge to the amount of the award.

on several significant EIR issues." These included the draft EIR's inadequate discussion of the navigational-safety impacts of the new boat-launch ramp's location, the incomplete discussion of water-quality and health effects of the opening of Seaside Lagoon to potentially unhealthy harbor water, and the failure to address the project's visual impact on views from the public park. As the court noted, the EIR is "the 'heart of CEQA.'" (*Citizens of Goleta Valley*, *supra*, 52 Cal.3d at 564.) And while the relief the court had granted respondents did not automatically require changes to the project, the court correctly observed that compliance with the additional procedures it had ordered could result in such changes. We see no basis to disturb the trial court's determination that respondents were successful parties. (See *Concerned Citizens*, *supra*, 131 Cal.App.4th at 334.)

Appellants argue the claims on which appellants did not prevail precluded successful-party status. But as explained, a party need not prevail on every claim to be considered a successful party under section 1021.5; "[r]ather, partial success is a factor to be considered by the trial court in determining the amount of fees awarded." (*Sweetwater*, *supra*, 36 Cal.App.5th at 983.)

### 2. *Enforcement of Important Public Right*

"This prong of section 1021.5 requires a determination of 'the "strength" or "societal importance" of the right involved.' [Citation.] 'That right may be constitutional or statutory, but it must be "'an important right affecting the

15

public interest'" -- it "cannot involve trivial or peripheral public policies."  Where, as here, the right vindicated is conferred by statute, "courts should generally realistically assess the significance of that right in terms of its relationship to the achievement of fundamental legislative goals."'"  (*Canyon Crest Conservancy v. County of Los Angeles* (2020) 46 Cal.App.5th 398, 410 (*Canyon Crest*).)  Courts have recognized that successful CEQA claims enforce an important public right.  (See, e.g., *Concerned Citizens, supra,* 131 Cal.App.4th at 335, 336 ["CEQA involves important rights affecting the people of this state" and "section 1021.5 was enacted to encourage the enforcement of such legislation by public interest litigation"]; *Rich v. City of Benicia* (1979) 98 Cal.App.3d 428, 435 (*Rich*) ["Unquestionably environmental concerns in general and the statutory policy in favor of use of [EIRs] in particular involve preeminently important public rights"].)

The trial court determined that respondents' victory advanced CEQA's legislative goals and policies by enforcing the public right to environmental disclosure of human-health, view, and safety impacts.  Appellants argue that respondents obtained only a minor technical victory, as the trial court merely required the City to conduct additional analysis and recirculate certain information.  We disagree.

As our Supreme Court has emphasized, the EIR's purpose "is to inform the public and its responsible officials of the environmental consequences of their decisions *before* they are made," thus "'protect[ing] not only the environment

16

but also informed self-government.'" (*Citizens of Goleta Valley, supra,* 52 Cal.3d at 564.) The relief appellants obtained below required the City to recirculate documents addressing the safety, health, and visual impacts of various aspects of the project. The City's compliance will give the public an opportunity to provide input on matters previously at least partially insulated from public debate, and will allow the City to consider all relevant and necessary data before making final decisions regarding the project. Respondents' successful claims therefore promoted the core objectives of an EIR and thereby served to enforce important public rights under CEQA. (See *Concerned Citizens, supra,* 131 Cal.App.4th at 335-336; *Rich, supra,* 98 Cal.App.3d at 435; *San Bernardino Valley Audubon Society, Inc. v. County of San Bernardino* (1984) 155 Cal.App.3d 738, 747, 753 [award of fees was not abuse of discretion where trial court invalidated EIR and ordered county to prepare new one].)

### 3. *Significant Benefit*

"[T]he 'significant benefit' that will justify an attorneys fee award need not represent a 'tangible' asset or a 'concrete' gain but, in some cases, may be recognized simply from the effectuation of a fundamental constitutional or statutory policy." (*Woodland Hills Residents Assn., Inc. v. City Council* (1979) 23 Cal.3d 917, 939; accord, *RiverWatch v. County of San Diego Dept. of Environmental Health* (2009) 175 Cal.App.4th 768, 781 (*RiverWatch*).) "Thus, successful CEQA actions often lead to fee awards under section 1021.5.

17

[Citations.] Moreover, the extent of the public benefit need not be great to justify an attorneys' fee award." (*RiverWatch, supra*, at 781; see also *Protect Our Water v. County of Merced* (2005) 130 Cal.App.4th 488, 496 [significant public benefit where litigation prompted agency to improve methods of creating and managing its CEQA records].) "[T]he trial court must 'determine the significance of the benefit, as well as the size of the class receiving benefit, from a realistic assessment, in light of all the pertinent circumstances, of the gains which have resulted in a particular case.' [Citation.] Thus, significant benefit and important right requirements 'dovetail' to some extent." (*Canyon Crest, supra*, 46 Cal.App.5th at 412.)

The trial court concluded respondents' successful claims conferred a significant benefit on the public by allowing it to provide additional input on human-health impacts from changes to Seaside Lagoon and on safety impacts from the boat-launch ramp's location. We find no fault in this conclusion.[4] (See *RiverWatch, supra*, 175 Cal.App.4th at 782 ["The significant benefit criterion is satisfied where, as here, the litigation permits affected parties to provide additional input on remand--in this case,

_____

[4]      *Concerned Citizens, supra,* 131 Cal.App.4th 329, cited by appellants, is inapposite. There, the Court of Appeal simply found no prejudicial abuse of discretion in the trial court's denial of attorney fees in connection with petitioners' proof of a "minor blemish" in the preparation of a mitigated negative declaration. (See *id.* at 335-336.))

18

to voice their concerns about environmental impacts on water sources, traffic and mitigation plans involving open space"].)

C. *Appellants' Challenges to the Amount of Attorney Fees*

"In California, the fee setting inquiry ordinarily begins with the 'lodestar,' i.e., the number of hours reasonably expended multiplied by the reasonable hourly rate. [Citation.] . . . . The reasonable hourly rate is the rate prevailing in the community for similar work. [Citation.] After arriving at the lodestar figure, the court may then adjust that figure based on a consideration of factors specific to the case to arrive at an amount representing the fair market value for the legal services provided. [Citation.] This approach 'anchors the trial court's analysis to an objective determination of the value of the attorney's services, ensuring that the amount awarded is not arbitrary.' [Citation.] Our Supreme Court has explained that an attorney fee award, including an award under Code of Civil Procedure section 1021.5, 'should be fully compensatory' and, absent 'circumstances rendering the award unjust, an . . . award should ordinarily include compensation for *all* the hours *reasonably spent*, including those relating solely to the fee.'" (*Building a Better Redondo, Inc. v. City of Redondo Beach* (2012) 203 Cal.App.4th 852, 870 (*BBR*).)

"[T]he court has broad discretion to determine the reasonableness of the fees claimed in light of a number of

19

factors, including the nature of the litigation, its difficulty, the skill required in its handling, the skill employed, the attention given, the success or failure, and other circumstances. [Citation] 'The "experienced trial judge is the best judge of the value of professional services rendered in his court, and while [the judge's] judgment is of course subject to review, it will not be disturbed unless the appellate court is convinced that it is clearly wrong."'" (*BBR*, *supra*, 203 Cal.App.4th at 873.)

### 1. *The Trial Court's Methodology*

#### a. *Background*

During the hearing on respondents' motion for attorney fees, the trial court commented on the process for determining the amount of fees: "To some extent, attorneys' fees are a plug issue. That is, . . . I go through the analysis, and then I look at the number. And I say to myself: Is that number in the reasonable range? Yes. Which is what I did. [¶] Does it matter to me whether it's a multiplier or it's part of the lodestar? Not really. As long as I get to a number that I think is reasonable. [¶] Could I have cut more and then increased the lodestar? Or could I have reduced the lodestar and cut less? I could have to reach this number." Later, in discussing an argument by respondents that the court's tentative ruling overly reduced the compensable time spent on their reply brief, the court noted it was allowing "a lot of hours" for the filing, and added, "If I didn't cut here, I could just cut the multiplier. Right? I could bring it up here

and make it a 1.3 multiplier and reach the same result." Finally, in a colloquy with the City's counsel regarding the amount of attorneys' fees, the court remarked, "It's just like [¶] . . . [¶] whack-a-mole.  You knock [¶] . . . [¶] one down; another one's going to pop up."

### b. *Analysis*

Appellants claim the trial court used an impermissible methodology in determining the amount of the award. Relying on the court's comments at the hearing on respondents' motion for fees, appellants assert the court simply chose a number it thought reasonable and adjusted the factors as needed to justify its predetermined number. We disagree.

Initially, we note appellants arguably forfeited their challenge by failing to object to the court's comments below. (See *Perez v. Grajales* (2008) 169 Cal.App.4th 580, 591-592 (*Perez*) ["arguments raised for the first time on appeal are generally deemed forfeited"].)  Regardless, appellants misconstrue the trial court's remarks.  The court explained its process for determining the fee amount:  "I go through the analysis, and then I look at the number.  And I say to myself: Is that number in the reasonable range?  Yes.  Which is what I did."  In other words, only after applying the appropriate analysis to determine the amount of the fee award, did the court consider whether the resulting number was reasonable given the circumstances of the case (and concluded it was).  Contrary to appellants' contention, the

court's comments did not suggest it arbitrarily selected an amount it thought fair. We need not address what the court said it could have done, but did not do.

Moreover, even assuming the trial court's comments at the hearing reflected a misapprehension of law, they would not warrant our intervention. The court's written decision on respondents' motion for fees employed the correct methodology and reflected no arbitrary selection of a subjectively fair amount. Appellants may not use the court's oral comments at the hearing to impeach the judgment. (See, e.g., *Jespersen v. Zubiate-Beauchamp* (2003) 114 Cal.App.4th 624, 633 (*Jespersen*) ["a judge's comments in oral argument may never be used to impeach the final order, however valuable to illustrate the court's theory they might be under some circumstances"].)

## 2. *Attorney Frank Angel's Hourly Rate*

### a. *Background*

Respondents requested an hourly rate of $650 for the work of Frank Angel, their lead attorney. In support of that rate, they noted that Angel had over 30 years of experience and had been recognized as a leading expert in his field. (See *BBR, supra,* 203 Cal.App.4th at 872 [superior court found that Angel, who was petitioners' lead counsel, "was a leading expert in the field of environmental, land use and administrative law"].) They further noted that in 2010, eight years before the fee proceeding in this case, the superior court in *BBR* awarded Angel fees at an hourly rate of $550.

Finally, respondents submitted a declaration by a retired Court of Appeal justice, filed in a different case, opining that in Southern California, attorneys who had over 25 years of experience had billing rates of $500 to $1,200 per hour.

Appellants objected to Angel's requested rate, arguing, inter alia, that *BBR* was far more complex than this case. They also contended that Angel, who was part of a small law firm, should not be compared with partners at large national firms, whose corporate clients are often willing to pay premium rates for reasons inapplicable to Angel. They also noted that Angel charged his clients in this case only $325 per hour. The trial court rejected appellants' arguments, noting Angel's experience and respondents' evidence regarding the prevailing rates in the region. The court also stated that this case was not straightforward, as it involved intricate CEQA issues, and that Angel capably represented respondents.

### b. Analysis

Appellants claim the trial court abused its discretion in refusing to reduce Angel's hourly rate of $650. "[T]he reasonable value of attorney services is variously defined as the "'hourly amount to which attorneys of like skill in the area would typically be entitled.'"" (*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1133 (*Ketchum*).) This reasonable market value serves as the basis for the lodestar calculation "even if the attorney has performed services pro bono or . . . for a reduced fee and regardless of whether the plaintiff is

23

represented by private or nonprofit counsel." (*BBR*, *supra*, 203 Cal.App.4th at 873.)

"The courts repeatedly have stated that the trial court is in the best position to value the services rendered by the attorneys in his or her courtroom [citation], and this includes the determination of the hourly rate that will be used in the lodestar calculus. [Citation.] In making its calculation, the court may rely on its own knowledge and familiarity with the legal market, as well as the experience, skill, and reputation of the attorney requesting fees [citation], the difficulty or complexity of the litigation to which that skill was applied [citations], and affidavits from other attorneys regarding prevailing fees in the community and rate determinations in other cases." (*569 East County Boulevard LLC v. Backcountry Against the Dump, Inc.* (2016) 6 Cal.App.5th 426, 437 (*569 East County Boulevard*).)

In concluding Angel's requested rate was reasonable, the trial court observed, inter alia: there was evidence that environmental lawyers in Southern California with over 25 years of experience charged rates ranging from $500 to $1,200 per hour; Angel had three decades of expertise in environmental and land-use litigation; and Angel himself had received fees based on an hourly rate of $550 for work in *BBR*, nearly a decade before the fee proceeding in this case. These facts amply supported the court's decision that an hourly rate of $650 was reasonable. (See *569 East County Boulevard*, *supra*, 6 Cal.App.5th at 436-437.)

In support of their argument that a rate of no more than $500 per hour would have been appropriate, appellants make two arguments. First, they argue that the $550 per hour rate in *BBR* should have functioned as a "ceiling" for Angel's rates because the superior court there opined this rate was on the "'high end,'" and because according to appellants, *BBR* was more complex than this case. Appellants overlook, however, that Angel had significantly less experience during the *BBR* litigation. The evidence before the trial court supported a range of $500 to $1,200 per hour for attorneys of similar or lesser experience. And we see no basis to reject the trial court's assessment that this case, too, was complex, and involved intricate CEQA issues.

Second, appellants argue that as an attorney at a small firm, Angel should not receive a $650 hourly rate, which they claim is appropriate only for attorneys at large national firms. They note that Angel charged his clients in this case only $325 per hour. These contentions ignore settled caselaw, under which even if an attorney charges a reduced fee, the reasonable market value of the work controls, based on the amount attorneys of like skill typically charge. (See *Ketchum*, *supra*, 24 Cal.4th at 1133; *BBR*, *supra*, 203 Cal.App.4th at 873; cf. *Rogel v. Lynwood Redevelopment Agency* (2011) 194 Cal.App.4th 1319, 1232 [allowing reduced fee award based on "a 'pro bono discounter' would lead to the anomalous result that the only cases in which fully compensatory fees can be awarded are those in which the prevailing plaintiffs actually have the ability to pay their

25

attorneys" (*id.* at 1233)].) Accordingly, the trial court did not abuse its discretion in deeming Angel's hourly rate of $650 reasonable.

### 3. *Reduction for Partial Success*

Appellants argue the trial court abused its discretion by reducing the lodestar by only 20 percent in accounting for respondents' partial success. They maintain the court was required to reduce the lodestar by 80 percent.

"[A] trial court may reduce attorneys' fees based on the plaintiff's degree of success." (*Save Our Uniquely Rural Community Environment v. County of San Bernardino* (2015) 235 Cal.App.4th 1179, 1185.) "A reduced fee award is "'appropriate if the relief, however significant, is limited in comparison to the scope of the litigation as a whole.""" (*Ibid.*) When accounting for partial success, the trial court "is not required to follow a formulaic reduction . . . based on the number and percentage of unsuccessful claims raised" (*Center for Biological Diversity v. County of San Bernardino* (2010) 185 Cal.App.4th 866, 898 (*Center for Biological Diversity*)), and may "'account for the qualitative as opposed to quantitative significance of the issues included in the [petition]'" (*RiverWatch*, *supra*, 175 Cal.App.4th at 783).

The trial court agreed that respondents' partial success warranted a reduction of the lodestar. The court concluded, however, that the 80 percent reduction appellants had requested was "far too severe" and would act as a deterrent to private attorney generals. It therefore reduced the

26

lodestar by 20 percent. In support of their contention that an 80 percent reduction of the lodestar was required, appellants note: (1) respondents prevailed on only four of over a dozen CEQA claims in their first and second causes of action; (2) about 30 percent of respondents' briefing focused on their unsuccessful third, fourth, and fifth causes of action; and (3) respondents abandoned and did not even brief their sixth cause of action.

Appellants provide no explanation or authority in support of their mixed approach, which focuses on the amount of briefing for some issues while focusing on the number of claims for others. In any event, the trial court was not required to follow such a formulaic approach and was entitled to consider the qualitative significance of the issues. (See *Center for Biological Diversity*, *supra,* 185 Cal.App.4th at 898; *RiverWatch*, *supra*, 175 Cal.App.4th at 783.) The court issued a written ruling in excess of 100 pages on the merits and was intimately familiar with the issues. It was, therefore, in the best position to assess the relative significance of the issues on which respondents prevailed. (*RiverWatch*, *supra,* at 783 ["Having presided over briefing and trial, the court was in the best position to assess the significance of the issues remanded for further consideration and action by [the public agency]"].) We find no abuse of discretion.

### 4. *Fees for Motion to Compel Production of a Privilege Log*

#### a. Background

Before trial, respondents complained the City was withholding certain documents from them based on unsupported claims of privilege, thereby preventing them from completing the preparation of the administrative record. Respondents then filed a motion to compel the City to produce a privilege log, asserting the City had neither disclosed what documents were being withheld, nor made a prima facie showing that any privilege applied. Judge Palazuelos, who was assigned the case at the time, denied respondents' motion, concluding the City had already identified all withheld documents and sufficiently justified withholding them.

Respondents' subsequent motion for attorney fees sought compensation for about 90 hours of work on the motion to compel. The City objected, asking the court to disallow time spent working on this motion because it was unsuccessful. The trial court (Judge Chalfant) found respondents had a plausible basis to file the motion and thus declined to deduct the entire time requested for it. The court agreed, however, that the time claimed for this fruitless motion was excessive, and thus reduced the compensable time by 20 hours or approximately 22 percent.

28

## b. *Analysis*

The City argues the court abused its discretion in refusing to disallow all time for the motion to compel. It contends this motion related solely to the sixth cause of action for violations of the California Public Records Act, which respondents later abandoned, and thus warranted no fees.

We disagree. Contrary to the City's assertion, respondents' motion to compel was not simply subordinate to their sixth cause of action; rather, respondents sought the privilege log to facilitate the preparation of the administrative record on which their entire action relied. That the motion was ultimately unsuccessful did not render counsel's work non-compensable. (See *City of Los Angeles v. Metropolitan Water Dist. of Southern California* (2019) 42 Cal.App.5th 290, 307 (*City of Los Angeles*) ["There is no requirement that each motion or opposition be successful to be reasonable"].) The trial court nevertheless reduced the allowable hours for this task by about 22 percent, in addition to a 20 percent across-the-board reduction of the lodestar for respondents' partial success, as discussed above. We find no abuse of discretion in the court's handling of the motion to compel.

The City contends respondents should not recover fees for the motion because it was factually frivolous, rather than merely unsuccessful. (See *City of Sacramento v. Drew* (1989) 207 Cal.App.3d 1287, 1303 ["A litigant should not be penalized for failure to find the winning line at the outset,

29

unless the unsuccessful forays . . . are such that a reasonably competent lawyer would not have pursued them"].) The City has arguably forfeited this contention by failing to assert it below. (See *Perez, supra,* 169 Cal.App.4th at 591-592.) In any event, neither Judge Palazuelos (who denied respondents' motion) nor Judge Chalfant (who granted fees for it) found the motion to be frivolous, and we decline the City's invitation to make such a finding on appeal.

### 5. *Fees for Motion to Sever the Fourth Cause of Action*

#### a. *Background*

A few months before trial, respondents moved to sever their fourth cause of action, which challenged the City's CEQA appeal procedures, so the court could rule on it before deciding their other causes of action. They argued that trying the fourth cause of action first would establish the scope of evidence that might be cited at trial on the other causes of action and lead to a more efficient resolution of the remaining issues. The trial court denied this motion, concluding that severing this cause of action would not serve the interests of justice and judicial economy and that doing so shortly before trial would unfairly prejudice appellants.

Respondents later sought fees for about 65 hours of work relating to their motion to sever. In arguing that the trial court should reduce the lodestar to reflect respondents' partial success, the City argued that time spent on the unsuccessful motion to sever should be attributed to the

30

unsuccessful fourth cause of action, and thus deducted from the lodestar.  As previously noted, the trial court did not calculate the time spent on particular unsuccessful claims, but instead reduced the lodestar amount by 20 percent to reflect respondents' partial success.  It did not expressly address respondents' motion to sever.

### b. Analysis

The City claims the court erred in failing to disallow all time spent on respondents' motion to sever because this work related solely to the unsuccessful fourth cause of action, which the City maintains was entirely distinct from respondents' successful claims.  The City asserts that fees may not be awarded for time spent on claims unrelated to the successful claims.

In fact, contrary to the City's claim, respondents' motion to sever was filed in aid of their entire action, including their successful CEQA claims.  Respondents' theory in support of severing the fourth cause of action was that it would settle all questions about the scope of the evidence and permit more efficient resolution of their remaining claims.  Nothing compelled the trial court to attribute time spent on the motion to sever to the fourth cause of action alone.  Moreover, that the motion itself was unsuccessful does not mean the court could not award respondents fees for time spent on it.  (See *City of Los Angeles, supra,* 42 Cal.App.5th at 307.)  As noted, the trial court reduced the lodestar by 20% to account for

respondents' partial success. We discern no abuse of discretion.

As it argued with regard to the motion to compel, the City argues the motion to sever should not entitle respondents to fees because it was frivolous, rather than merely unsuccessful. Here, too, the City arguably forfeited this contention by failing to assert it below. (See *Perez, supra*, 169 Cal.App.4th at 591-592.) Regardless, the City rests its assertion of frivolousness solely on the trial court's finding that granting the motion shortly before trial would unfairly prejudice appellants. Yet a finding that on balance, a motion's requested relief would unfairly prejudice the opposing party, does not constitute a finding that the motion was frivolous.

### 6. *Fees for Attendance of City Council Meeting*

#### a. *Background*

Respondents sought fees for their counsel's attendance of a June 2017 City council meeting. According to counsel's billing statements, their activity at the meeting included (1) addressing the council about the boat-launch ramp's location, and (2) making a statement "to correct misinformation" to a recent court filing by respondents, among several other activities.

The City objected to any award of fees for this activity, arguing it was unrelated to the case because it took place months after the litigation commenced. The trial court disagreed, ruling that respondents could reasonably bill for

32

hours that "causally sprang from the CEQA violations" they alleged. It therefore awarded fees for counsel's attendance of the meeting.

### b. *Analysis*

The City argues respondents' counsel's attendance at the June 2017 City council meeting was not compensable. It repeats its contention in the trial court that this activity was unrelated to this case because it took place months after respondents filed their petition, and it asserts that counsel's statement "to correct misinformation" concerned a proceeding before the Coastal Commission that had nothing to do with respondents' claims in this case.

At least some of counsel's activity at the meeting, however, concerned a CEQA issue respondents targeted in their petition: the location of the boat-launch ramp. The City offers no authority for the position that any appearance before the City council following the filing of the petition could not be compensated. Moreover, even assuming the Coastal Commission matter was entirely unrelated to this case (something the City did not argue below), the City has neither attempted to identify how much time counsel dedicated to this matter, nor argued that the time counsel reported for this meeting should be reduced due to impermissible block-billing. Thus, the City has forfeited any contention based on the subject matter of the Coastal Commission proceeding. (See *Sviridov v. City of San Diego* (2017) 14 Cal.App.5th 514, 521 (*Sviridov*).)

33

## 7. *Fees for Untimely Comment Letters*

### a. *Background*

Very shortly before the City's hearing on respondents' administrative appeal, respondents submitted various comment letters regarding the merits of their appeal and the City's appeal procedures. The City rejected these letters as untimely under its appeal procedures, but also briefly addressed some of respondents' contentions on the merits.

Respondents later sought fees for time spent on these comment letters. The City argued this work should not be compensated because the letters were untimely. The trial court agreed that untimely work should not be compensated, but faulted the City for failing to "provide a precise sum of fees attributable to this work," and noted that the City also addressed the merits of some of respondents' arguments in the comment letters. The court therefore awarded respondents fees for time spent on the comment letters.

### b. *Analysis*

The City claims the trial court erred in granting respondents fees for work on the untimely comment letters. It argues it should not be penalized for addressing the untimely comments on their merits. However, the City fails to address the other ground the trial court provided for rejecting its objection to the award of fees for the comment letters, namely, that the City had failed to provide a precise sum attributable to this work. The City has therefore

forfeited its challenge to the trial court's ruling. (See *Ruelas v. Superior Court* (2015) 235 Cal.App.4th 374, 383 [trial court's judgment is presumed correct, and appellant has burden to affirmatively demonstrate error].)

### 8. *Excessive and Duplicative Hours for Particular Filings*

Appellants claim the trial court allowed respondents to claim excessive and duplicative time for their petition and first amended petition, opening and reply briefs, and fee motion. They also maintain that some of counsel's billing was not credible, and that counsel engaged in impermissible block-billing relating to the preparation of the reply brief.

As the *BBR* court explained: "It is not our role, however, to second-guess the trial court on such matters as whether the hours expended are justified by the product produced . . . . The trial court was fully cognizant of the quality of the services performed, the amount of time devoted to the case and the efforts of counsel. [Citation.] We reiterate that "'[t]he value of legal services performed in a case is a matter in which the trial court has its own expertise.'"" (*BBR, supra*, 203 Cal.App.4th at 874.) Here, the trial court described the briefs, including respondents', as "incredibly thorough and well-constructed." Nevertheless, agreeing that some of respondents' billing was excessive and that it included impermissible block-billing relating to the reply brief, the court reduced the lodestar accordingly. That appellants would have preferred a greater reduction

35

provides no basis to reject the court's assessment of respondents' filings and the time reasonably spent on them. (See *ibid.*)  Nor will we intervene in the court's credibility determinations.  (See *Christian Research Institute v. Alnor* (2008) 165 Cal.App.4th 1315, 1319 [appellate court may not reweigh trial court's determination of billing statements' credibility].)  Appellants fail to establish error in the court's determinations.

### 9. *The Fee Enhancement*

Appellants claim the trial court abused its discretion in applying a 1.4 multiplier to the lodestar amount, arguing respondents deserved no fee enhancement.  As explained, a trial court may adjust the lodestar figure based on factors specific to the case to arrive at a fair market value for the legal services provided.  (*BBR*, *supra*, 203 Cal.App.4th at 870.)  Relevant factors may include, inter alia, (1) the novelty and difficulty of the questions involved, (2) the skill displayed in presenting them, (3) the extent to which the nature of the litigation precluded other employment by the attorneys, (4) the contingent nature of the fee award, (5) whether the attorneys received public or charitable funding to bring lawsuits of this kind, and (6) whether an award against a public entity would ultimately fall on the taxpayers.  (*Ketchum, supra,* 24 Cal.4th at 1134; *Maria P. v. Riles* (1987) 43 Cal.3d 1281, 1294.)

The court found that the case was complex and raised a novel issue involving a "rarely used provision" of CEQA.  It

36

further found that respondents' counsel "showed commendable skill in presenting these issues and litigating them." The court then noted that respondents and counsel agreed to a $90,000 fee cap and a substantially reduced hourly rate, but that respondents were ultimately unable to afford even the cap, paying counsel only about $66,000. Because counsel bore much of the risk of failure, the court concluded their fees were partially contingent on success. These factors, the court found, warranted a fee enhancement. The court considered whether the award would likely fall on taxpayers (militating against an enhancement), but concluded this was unlikely, as real parties had agreed to indemnify the City for any attorney fee award.[5]

Disputing the trial court's conclusions, appellants contend there was "nothing complex about this case," which "was a typical, run-of-the-mill CEQA action." They also argue the court gave too much weight to counsel's skill, given respondents' limited success on the merits. Yet it was the trial judge, not this court, who considered the parties' briefing and evidence and issued an extensive written ruling on the merits of respondents' claims. We are neither

---

[5]     Appellants assert that respondents admitted in their briefing below that the fee award was likely to fall on the taxpayers, given disputes between real parties and the City. They are mistaken. Respondents argued below that real parties may attempt to avoid paying *respondents*, and suggested that the City would be better positioned to compel real parties to pay.

inclined nor permitted to jettison the trial court's assessment of counsel's skill and the complexity and novelty of the claims, matters with which it was uniquely familiar. (See *Graham v. DaimlerChrysler Corp.* (2004) 34 Cal.4th 553, 581 [calculation of attorney fee enhancements is highly fact-specific matter best left to trial court's discretion]; *BBR*, *supra*, 203 Cal.App.4th at 873 ["'The "experienced trial judge is the best judge of the value of professional services rendered in his court"'"].) We see nothing unreasonable in the trial court's assessment of the case's difficulty, and again note that the court was sufficiently impressed with counsel's work product to comment favorably on it.

Appellants claim that given the retainer agreement between respondents and their counsel, the attorneys "took practically no risk in filing this action." Like the trial court, we disagree. Respondents' counsel spent about eighteen months -- from November 2016 to May 2018 -- litigating the merits of this action, and their compensable work yielded an adjusted lodestar of about $429,000. It can hardly be said that the roughly $66,000 counsel actually collected from respondents, or the $90,000 cap under counsel's original agreement with respondents, eliminated counsel's risk of nonrecovery. The trial court did not abuse its discretion by granting respondents a fee enhancement.

10. *Joint and Several Liability*

The City argues the trial court erred in holding it jointly and severally liable with real parties for the fee

38

award.  It asserts this ruling was inconsistent with the court's finding that the award was unlikely to fall on the taxpayers because of the indemnity agreement between the City and real parties.

There was no inconsistency.  As discussed, in granting a fee enhancement, the trial court concluded that the fee award was unlikely to fall on the taxpayers because real parties would be required to indemnify the City for its payment of fees under the terms of their indemnity agreement.  Requiring the City to pay the fees, which it should later be able to recover from real parties, presents no conflict.  It also makes sense:  joint and several liability would likely allow respondents to recover the fee award without difficulty, even if real parties somehow attempt to avoid paying; and given appellants' indemnity agreement and preexisting relationship, the City would likely be better positioned to compel real parties to pay promptly.  Finally, it is in accord with the law.  (See *Friends of the Trails v. Blasius* (2000) 78 Cal.App.4th 810, 838 ["Treating the Code of Civil Procedure section 1021.5 obligation of more than one opposing parties as joint is consistent with the purposes of that statute.  If the obligation is apportioned in the sense that it is not joint[,] the successful party faces greater difficulty in collection of the judgment for attorney's fees"].)

39

D. *Appellants' Challenge to Respondents' Entitlement to Costs*

Appellants challenge the trial court's award of costs to respondents. They maintain that given respondents' partial success, the court abused its discretion in concluding respondents were prevailing parties under section 1032. Under that provision, a "prevailing party" entitled to costs includes (1) a party with a net monetary recovery, (2) a defendant in whose favor a dismissal is entered, (3) a defendant where no party obtains any relief, and (4) a defendant as against those plaintiffs who do not recover any relief against that defendant. (§ 1032, subd. (a)(4).) "If any party recovers other than monetary relief and in situations other than as specified, the 'prevailing party' shall be as determined by the court, and under those circumstances, the court, in its discretion, may allow costs . . . ." (*Ibid.*)

It is undisputed that respondents obtained nonmonetary relief but did not fall within the statute's enumerated circumstances, and thus whether they were prevailing parties eligible to recover costs was a matter for the trial court's discretion. Under these circumstances, courts have applied the same principles governing the "successful party" determination under section 1021.5 to the "prevailing party" determination under section 1032. (See *Bowman v. City of Berkeley* (2005) 131 Cal.App.4th 173, 183 ["The City's contention with respect to costs is the same as the one it advances on the 'successful party' test for the recovery of fees, namely that the [petitioners] cannot be

40

regarded as prevailing parties . . . . We reject that argument for the reasons previously stated"]; *Sokolow v. County of San Mateo* (1989) 213 Cal.App.3d 231, 243-245, 251 [appellants were prevailing parties entitled to costs under § 1032 for the same reasons they were successful parties entitled to attorney fees under § 1021.5]; *California Common Cause v. Duffy* (1987) 200 Cal.App.3d 730, 752 [similar].) For the same reasons discussed in connection with the attorney fee award, the trial court did not abuse its discretion in determining that respondents were prevailing parties eligible for costs under section 1032.

### E. *The City's Challenge to the Amount of Costs*

#### 1. *Background*

In preparing the administrative record for this action, respondents' counsel used volunteers to transcribe certain administrative hearings. Ellis Raskin, one of respondents' attorneys, then proofread the transcripts. Raskin also assembled the administrative record and prepared the accompanying index. Respondents later requested costs for the preparation of the administrative record, including for time Raskin spent on proofreading the transcripts. For Raskin's time, respondents sought his hourly billing rate. In their motion to tax costs, appellants objected to Raskin's rate for time spent compiling the administrative record, arguing this was a task for a paralegal. As to the transcripts, appellants asked the trial court to disallow time Raskin spent proofreading them, arguing respondents' process was

41

wasteful.  They did not object to Raskin's billing rate for this task.

Before the hearing on appellants' motion to tax costs, the trial court issued a tentative ruling that (1) reduced the hourly rate for Raskin's preparation of the record, concluding it was unnecessary for an attorney to perform this task, but (2) allowed the time Raskin spent proofreading administrative hearing transcripts.  At the ensuing hearing, the parties discussed the compilation of the administrative record, with the court reiterating its view that respondents were not entitled to an attorney's billing rate for this task.  As the parties proceeded to discuss the transcripts, the court stated that proofreading the transcript was necessary, but asked: "[D]oes it need to be a lawyer?  Well, didn't I pay him at paralegal [rate]?"  Real parties' counsel replied that the court's tentative ruling awarded an attorney's rate for this task, and asked that it reduce the rate.  The court responded:  "Mr. Raskin, I'm giving you a bonus here.  I'm not going to cut this rate."  The court then adopted its tentative ruling, modified in a way not relevant here, as its final ruling.

## 2. *Analysis*

On appeal, the City argues the trial court erred in awarding respondents an attorney's hourly rate for time Raskin spent proofreading the transcripts prepared by volunteers.  Allowable costs under section 1032 must be reasonably necessary to the conduct of the litigation rather

than merely convenient or beneficial and must be reasonable in amount. (§ 1033.5, subd. (c)(2) & (3).)

The City presents no meaningful argument that awarding an attorney's rate for this task was inherently erroneous; rather, its sole contention is that the court acted arbitrarily because it had already found that a paralegal could have performed the task but nevertheless refused to reduce the awarded rate, choosing to give Raskin a "'bonus.'" The City has therefore forfeited any argument that awarding an attorney's rate for this task was categorically erroneous. (See *Sviridov, supra*, 14 Cal.App.5th at 521.)

As to the argument it does make, the City is mistaken. The trial court never found that it was not reasonably necessary to have an attorney perform the proofreading task. Rather, the court found that it was not reasonably necessary to have an attorney compile the administrative record, and it therefore reduced Raskin's rate for that task. As to the proofreading task, the court merely questioned whether it was reasonably necessary to have an attorney perform it. Given that the court declined to reduce the awarded rate for this task, we presume the court determined it was. (See § 1033.5; *People v. Bush* (2016) 245 Cal.App.4th 992, 1002 [trial court presumed to follow the law].) The City may not use the court's comment at the hearing to impeach the judgment, which discloses no error. (See, e.g., *Jespersen, supra*, 114 Cal.App.4th at 633.)

43

## DISPOSITION

The trial court's orders awarding attorney fees and costs are affirmed.  Respondents are awarded their costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

MANELLA, P. J.

We concur:

WILLHITE, J.

COLLINS, J.

44